UNITED STATES, Appellee

v.

Levi A. KEEFAUVER, Specialist
U.S. Army, Appellant

No. 15-0029
Crim. App. Dkt. No. 20121026
United States Court of Appeals for the Armed Forces

Argued April 15, 2015
Decided June 12, 2015

RYAN, J., delivered the opinion of the Court, in which BAKER
C.J., and ERDMANN, STUCKY, and OHLSON, JJ., joined.

Counsel

For Appellant: Captain Patrick J. Scudieri (argued); Lieutenant
Colonel Jonathan F. Potter, Colonel Kevin Boyle, and Major Amy
E. Nieman (on brief).

For Appellee: Captain Benjamin W. Hogan (argued); Major A. G.
Courie III and Colonel John P. Carrell (on brief); Major Daniel
Derner.

Amicus Curiae for Appellant: Curtis J. Hinca (law student)
(argued); Catherine E. White (law student) and Steven H. Wright,
Esq. (supervising attorney) (on brief) - University of Wisconsin
Law School.

Amicus Curiae for Appellee: Veronica Sustic (law student)
(argued); Jake Blair (law student) and John A. Pray, Esq.
(supervising attorney) (on brief) - University of Wisconsin Law
School.

Military Judges: Timothy Grammel and Steven Walburn

**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

United States v. Keefauver, No. 15-0029/AR

Judge RYAN delivered the opinion of the Court.

A military judge sitting as a general court-martial convicted Appellant, contrary to his pleas, of two specifications of violating of a lawful general regulation by wrongfully possessing drug paraphernalia and unregistered weapons on post, one specification of wrongful possession of marijuana, and one specification of child endangerment in violation of Articles 92, 112a, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 912a, 934 (2006). Appellant was sentenced to a bad-conduct discharge, four years' confinement, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

The United States Army Court of Criminal Appeals (ACCA) reviewed the case pursuant to Article 66, UCMJ, 10 U.S.C. § 866 (2012), and affirmed.[1] United States v. Keefauver, 73 M.J. 846, 848, 858 (A. Ct. Crim. App. 2014). We granted Appellant's petition to review the following issue only:

> WHETHER THE ARMY COURT ERRED IN FINDING THE PROTECTIVE
> SWEEP WAS APPROPRIATE IN TOTAL.

---

[1] Oral argument in this case was heard at University of Wisconsin Law School, Madison, Wisconsin, as part of the Court's "Project Outreach." See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

We hold that the military judge and ACCA erred in upholding the protective sweep. As both the evidence in support of the bulk of the charges and the entirety of the ACCA's opinion are inextricably intertwined with the protective sweep of Appellant's home, we reverse the ACCA and remand for further proceedings consistent with this opinion.

## I. FACTS

On December 8, 2011, between 7:30 a.m. and 7:45 a.m., postal inspectors at the Louisville, Kentucky, postal processing center notified Inspector Steven Lamp in Bowling Green, Kentucky, that they had discovered a suspicious, heavily taped box that smelled of marijuana. They transported the package to Bowling Green, where Inspector Lamp determined, based on his training and experience, that the box, measuring fifteen inches by twelve inches by ten inches and weighing eight pounds, likely contained marijuana. He determined that no one by the sender's name, "B. Samuelson," currently resided at the California return address, but that Appellant and his wife, to whose joint residence the package was addressed, had previously claimed that California address as their own. Because the package was addressed to a Fort Campbell address, Inspector Lamp notified the Criminal Investigation Command (CID) office's Drug Suppression Team Chief, Special Agent (SA) Steven Roche. At SA Roche's request, Inspector Lamp and two other inspectors

3

transported the package to Fort Campbell, joining SA Roche at CID by late morning.

At approximately 11:00 a.m., SA Roche obtained verbal authorization from Captain (CPT) Mark Robinson, the military magistrate, to conduct a "controlled delivery," whereby a postal inspector would pose as the regular mail carrier and agents would enter the house after the package was taken inside to seize the box and search the room or immediate area in which it was found.[2]  At approximately 1:00 p.m. at CID, a military working dog (MWD) "alerted on the box," confirming it likely contained a controlled substance.  Agents took the package from CID to the Fort Campbell Post Office, where it was scanned as having arrived at 1:14 p.m.  SA Roche then arranged for surveillance teams in front of and behind Appellant's house as well as down the street.

Agents knew four persons lived at the address -- Appellant; his wife; his sixteen-year-old stepson, TC-D; and his thirteen-year-old son, EK -- but that none had been seen entering or exiting since surveillance began.  They also knew that no one at the address had a firearm registered in his or her name.

---

[2] The confusion over the exact terms and parameters of CPT Robinson's verbal authorization at trial highlights the danger of using a verbal rather than a written authorization to search. The record supports the military judge's finding that the authorization was limited to the box itself.  United States v. Burris, 21 M.J. 140, 144 (C.M.A. 1985).

A postal investigator made the controlled delivery at 2:36 p.m., first knocking on the door, then, when no one answered, leaving the package on the porch next to the front door. The package remained on the porch until TC-D arrived home at 3:20 p.m. and took it inside. Shortly thereafter, CID agents and postal inspectors moved in, knocking on the front door. When TC-D answered the door, agents informed him that they would be conducting a search. In response, TC-D became verbally abusive. Agents asked TC-D to step outside, where they handcuffed him and seated him next to the garage. SA Roche entered the home and found the package in the hallway, ten feet from the entrance. He noticed a strong odor of marijuana in the house.[3] SA Roche conducted what he characterized as a "security sweep" of the entire house. While sweeping the kitchen, SA Roche saw drug paraphernalia on the counter. On the second floor, SA Roche discovered a bag of what appeared to be marijuana as well as additional drug paraphernalia in TC-D's room, rifles in an unlocked walk-in closet off the hallway, and suspicious boxes in the master bedroom, all in plain view. Based on a misunderstanding of the verbal search authorization, agents then

---

[3] We did not grant the issue, and do not decide the question, whether it was improper for the ACCA to consider evidence that agents smelled marijuana in the house, which evidence was not before the military judge when he ruled on the motion to exclude evidence from the protective sweep. Resolution of that question does not affect the outcome in this case.

reentered the house and conducted a second, full search of the home with MWDs.

Before trial, Appellant moved to suppress all evidence other than the box of marijuana on the grounds that the search authorization to seize it was defective in relation to the search of his home. Appellant argued that the authorization to do anything other than seize the package inside his home was not based on probable cause, as the package was addressed to the residence rather than its residents, and, moreover, that the authorization failed to describe the place to be searched and things to be seized with requisite particularity. Applying a standard echoing Maryland v. Buie, 494 U.S. 325, 334 (1990), the military judge denied the motion on the ground that the evidence resulting from "the continued search of the house . . . beyond what the magistrate had authorized" after the protective sweep "would have inevitably been discovered," as "there was overwhelming evidence to support a request for search authorization" based on the box's delivery plus the "marijuana, drug paraphernalia, and weapons in that residence" seen during the protective sweep. In his view, the protective sweep was proper because agents could reasonably have believed "an individual or individuals who posed a danger to the agents may have been hiding in the residence" given the quantity of marijuana present and the inference that residents were engaging

in drug distribution, as "[i]t is common knowledge that drug trafficking involves violence, including the use of weapons." The military judge concluded that TC-D's hostile response to the agents' announced intent to enter the house and conduct a search supported this belief.

## II. ACCA DECISION

The ACCA affirmed the ruling of the military judge that the protective sweep was valid under Buie based on the facts that the package containing marijuana was taken inside the home; Appellant, his wife, and their two sons lived there; agents' lack of information about the adults' whereabouts; and TC-D's reaction to the agents' presence. Keefauver, 73 M.J. at 853-54. Moreover, the ACCA determined that expert testimony on the suppression motion from Inspector Lamp asserting that "guns follow drugs," while it could not per se authorize a protective sweep, could be considered by the military judge in conjunction with the other facts. Id. at 853. The ACCA went on to hold that evidence from the later post-sweep search of Appellant's house using MWDs was properly admitted under the inevitable discovery doctrine because the drugs, weapons, and drug paraphernalia observed during the protective sweep provided agents with probable cause to seek a wider warrant. Id. at 854-57.

7

III.   DISCUSSION

"When reviewing a decision of a Court of Criminal Appeals on a military judge's ruling, 'we typically have pierced through that intermediate level' and examined the military judge's ruling, then decided whether the Court of Criminal Appeals was right or wrong in its examination of the military judge's ruling."  United States v. Cabrera-Frattini, 65 M.J. 241, 246 (C.A.A.F. 2007) (quoting United States v. Shelton, 64 M.J. 32, 37 (C.A.A.F. 2006)) (quoting United States v. Siroky, 44 M.J. 394, 399 (C.A.A.F. 1996)) (internal quotation marks omitted). This Court reviews a military judge's decision to suppress evidence for an abuse of discretion.  United States v. Monroe, 52 M.J. 326, 330 (C.A.A.F. 2000) (citing United States v. Ayala, 43 M.J. 296, 298 (1995)).  Fact-finding is reviewed under the clearly erroneous standard while conclusions of law are reviewed de novo.  Id.  "[W]e consider the evidence in the light most favorable to the prevailing party."  United States v. Reister, 44 M.J. 409, 413 (C.A.A.F. 1996) (internal quotation marks omitted).  Whether facts in toto justify a protective sweep is a question of law.  See United States v. Scroggins, 599 F.3d 433, 440-41 (5th Cir. 2010); United States v. Cash, 378 F.3d 745, 747 (8th Cir. 2004); United States v. Gould, 364 F.3d 578, 592 n.16 (5th Cir. 2004), abrogated on other grounds by Kentucky v. King, 131 S. Ct. 1849 (2011).  But see United States v. Hauk, 412 F.3d

8

1179, 1185 (10th Cir. 2005) (mixed question of law and fact reviewed de novo).

While we agree that the analysis in Buie may be properly applied to a protective sweep incident to execution of a search warrant for a home, we disagree that either of the two criteria that Buie established were satisfied by the facts of this case.

A.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. In Buie, the Supreme Court created an exception to the Fourth Amendment for a "protective sweep," which is "a quick and limited search of premises, incident to arrest and conducted to protect the safety of police officers or others." 494 U.S. at 327. Buie acknowledged two types of protective sweeps. In the first type of sweep, which may be conducted "as a precautionary matter and without probable cause or reasonable suspicion," agents may search only "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" during or after an arrest. Id. at 334. The second, more extensive Buie exception permits agents to make a protective sweep of areas beyond those immediately adjoining the place of arrest where

9

"articulable facts . . . taken together with the rational inferences from those facts . . . would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. "[S]uch a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." Id. at 335.

Buie analyzed the constitutional permissibility of a protective sweep in the context of arrest only, reasoning that in-home arrests create special dangers by placing agents on an "adversary's 'turf'" and exposing them to the unique threat of "[a]n ambush in a confined setting of unknown configuration." Id. at 333. The Court noted, "[a] protective sweep . . . occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him." Id.

This Court has not elsewhere addressed the question whether the protective sweep doctrine applies beyond the context of an in-home arrest. Cf. United States v. Khamsouk, 57 M.J. 282, 304 (C.A.A.F. 2002). However, a majority of federal circuit courts have held that agents entering a home lawfully for an objective other than arrest may make a protective sweep so long as the Buie criteria are met. In their view, the same concerns

10

underlying officer safety in the context of an in-home arrest may pertain in equal measure when agents lawfully enter a home for some other purpose.  See, e.g., United States v. Starnes, 741 F.3d 804, 810-11 (7th Cir. 2013); United States v. Caraballo, 595 F.3d 1214, 1225 (11th Cir. 2010); United States v. Miller, 430 F.3d 93, 99-100 (2d Cir. 2005); United States v. Martins, 413 F.3d 139, 150 (1st Cir. 2005); Leaf v. Shelnutt, 400 F.3d 1070, 1086-87 (7th Cir. 2005); Gould, 364 F.3d at 584; United States v. Taylor, 248 F.3d 506, 513 (6th Cir. 2001); United States v. Garcia, 997 F.2d 1273, 1282 (9th Cir. 1993); United States v. Patrick, 959 F.2d 991, 996-97 (D.C. Cir. 1992), abrogated on other grounds by United States v. Webb, 255 F.3d 890 (D.C. Cir. 2001).  Only the Tenth Circuit and one panel of the Ninth Circuit have read Buie so narrowly as to limit the protective sweep doctrine to in-home arrests only.  See United States v. Davis, 290 F.3d 1239, 1242 n.4 (10th Cir. 2002); United States v. Reid, 226 F.3d 1020, 1027 (9th Cir. 2000).  These cases place great interpretive weight on Buie's focus on in-home arrests, 494 U.S. at 333-36, and its definition of a protective sweep as "incident to an arrest."  Id. at 327.

Without question, the minority view is correct that Buie specifically addressed only the facts of that case, surrounding a protective sweep incident to an in-home arrest.  This does not, however, preclude application of Buie's rationale to other

11

circumstances when consonant with, and a consistent extension of, Buie. See Miller, 430 F.3d at 99 ("Buie's logic therefore applies with equal force when officers are lawfully present in a home for purposes other than the in-home execution of an arrest warrant . . . ."). We agree with the majority of federal circuits that, as with an arrest, executing a search warrant in a home can present the dangers upon which the rationale of Buie was based, as it, too, places agents on the occupant's "turf," at a disadvantage, and is an adjunct to a "serious step," since probable cause to conduct a search for evidence has been established and may result in arrest and prosecution. Buie, 494 U.S. at 333.

## B.

While we thus squarely hold that, under Buie, agents entering a home lawfully may be entitled to make the second, more extensive type of protective sweep to ensure their safety, this extension of Buie to non-arrest situations should not be mistaken for a liberalization of the criteria required before such a sweep is constitutionally permissible. The fact that agents may conduct a protective sweep incident to a lawful entry under Buie so long as the sweep does not last longer "than is necessary to dispel the reasonable suspicion of danger," id. at 336, does not answer the altogether different question whether any facts supported the belief that there were people other than

12

TC-D present in the home in this case and, if so, that they presented a danger to the agents. We conclude that the facts here did not and that, absent such facts, the extensive protective sweep conducted of the entire home was not warranted.

The circumstances under which facts warrant an extensive protective sweep are specific. Id. at 327, 334. Buie notes that this broader protective sweep exception applies only "if the searching officer 'possess[ed] a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]" the officer in believing' that the area swept harbored an individual posing a danger to the officer or others." 494 U.S. at 327 (quoting Michigan v. Long, 463 U.S. 1032, 1049–50 (1983)) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (brackets in original) (emphasis added); see United States v. Ford, 56 F.3d 265, 269 n.3 (D.C. Cir. 1995) (interpreting Buie to require the lower court to determine "whether the searching officer possessed 'a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene'" on remand). The opinion goes on to test this belief against an objective standard, requiring also that "articulable facts . . . taken together with the rational inferences from those facts . . . would warrant a reasonably prudent officer in believing that the area to be

13

swept harbors an individual posing a danger to those on the arrest scene." Buie, 494 U.S. at 334 (emphasis added). The objective standard echoes Terry. 392 U.S. at 21-22 (noting "it is imperative that the facts [used to justify a search or seizure] be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"). See, e.g., Miller, 430 F.3d at 98 ("At the core of Terry, Long and Buie is the common understanding that the Fourth Amendment's reasonableness requirement is sufficiently flexible to allow officers who have an objectively credible fear of danger to take basic precautions to protect themselves."); United States v. Garza, 125 F. App'x 927, 931 (10th Cir. 2005) ("The Fourth Amendment allows a protective sweep if police have 'a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[s] the officer in believing that the area swept harbor[s] an individual posing a danger to the officer or others.'" (alterations in original) (internal citations and quotation marks omitted)); United States v. Biggs, 70 F.3d 913, 915 (6th Cir. 1995) (requiring searching agents to "articulate facts that would warrant a reasonably prudent officer to believe that the area to

be swept harbored an individual posing a danger to those on the scene").

It is thus eminently clear both that a protective sweep of the home "is decidedly not 'automati[c],'" Buie, 494 U.S. at 336, and that the facts in this case fail the test laid out in Buie.  A protective sweep of the home requires specific, articulable facts and rational inferences from those facts supporting two beliefs:  (1) that the areas to be swept harbor one or more individuals and (2) that the individual or individuals pose a danger to the agents or others.  Id. at 334.  The Government did not attempt to prove that the searching officer held either such belief, nor did it present facts and inferences that would objectively support either such belief.

The searching officer, SA Roche, did not testify that he believed at any point that additional individuals were present and dangerous.  Rather, in perfect opposition to Buie's caution against "automatic" sweeps, SA Roche stated the sweep was "standard procedure."  While an officer's mistake of law may sometimes bear on a potential Fourth Amendment violation, Heien v. North Carolina, 135 S. Ct. 530 (2014), that is not the case here.  "The Fourth Amendment tolerates only reasonable mistakes, and those mistakes . . . must be objectively reasonable."  Id. at 539.  Unlike the North Carolina statute at issue in Heien, id. at 540, Buie's requirements and its prohibition against

15

automatic sweeps are unambiguous.  Any mistake of law on the
part of SA Roche was not objectively reasonable.  Moreover, in
Heien, the officer's "mistake of law relate[d] to the antecedent
question of" reasonable suspicion for a stop, not the search
itself, which was done with the appellant's consent.  Id. at
539.  "An officer's mistaken view that the conduct at issue did
not give rise to . . . a [Fourth Amendment] violation -- no
matter how reasonable -- could not change that ultimate
conclusion."  Id.

And assuming arguendo that SA Roche had testified to an
articulable actual fear, we disagree with both the military
judge and the ACCA that the facts presented, even viewed in the
light most favorable to the Government, objectively supported a
protective sweep of the home.  Rather, the available facts
supported only the reasonable inference that no one but TC-D was
home that afternoon:  Appellant was employed on base; no one
testified that they saw anyone enter or exit the home during a
period of surveillance of at least one hour prior to the
delivery of the package; no one answered the door prior to TC-
D's arrival, id.; and an eight-pound package containing a
valuable, illicit substance was left outside for an hour.  And
during the motions hearing, Inspector Lamp in fact testified to
his own inference from these facts that "nobody was home."  In
this context, lack of knowledge of the other inhabitants'

whereabouts did not provide an affirmative basis for conducting a protective sweep.  See United States v. Colbert, 76 F.3d 773, 778 (6th Cir. 1996); United States v. Hogan, 38 F.3d 1148, 1150 (10th Cir. 1994); see also United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1298 (9th Cir. 1988).

Given the absence of facts supporting the antecedent belief required by the first prong of Buie, that there was another person present in the home, 494 U.S. at 334, the second prong of Buie, which requires articulable facts supporting the belief that the "individual pos[es] a danger to those on the arrest scene," id., necessarily fails.  We nonetheless make clear that, contrary to the belief of the military judge, the presence or suspected presence of drugs without more does not justify a sweep, see, e.g., United States v. Watson, 273 F.3d 599, 603 (5th Cir. 2001), nor does the bare conjecture and bald assertion that "guns follow drugs," without additional facts.  See Taylor, 248 F.3d at 514 (citing United States v. Hatcher, 680 F.2d 438, 444 (6th Cir. 1982)).  To suggest, as the military judge did, that the mere presence of drugs justifies a protective sweep of the entire home would effectively eviscerate the exception to the Fourth Amendment contemplated by Buie, which was based entirely on the danger to agents.  494 U.S. at 327, 333-34.  We decline to create so broad an exception to the Fourth Amendment.

The Government nonetheless argued at oral argument that a verbally hostile teenager and the odor of marijuana alone justified a rational inference both that other people were present and that they presented a danger to agents. We cannot agree. In light of the other facts suggesting no one else was home, TC-D's adverse reaction to officers' stated intention to search without more did not support a reasonable inference that other individuals were present, nor, even if they were, that they presented a danger to agents.[4] TC-D was quickly handcuffed and removed from the house, and he presented no danger to agents. Nor, even were we to consider it, does the lingering odor of marijuana smoke, without more, support a belief that others were present.

Most tellingly, even if one credits the notion that a hostile teenager and the smell of marijuana could create a reasonable inference that others were present under the facts of this case, absolutely no facts supported an inference of a potential for danger or violence, as has been true in other cases in which protective sweeps have been upheld. Agents neither knew of nor encountered unsecured pit bulls, Starnes, 741 F.3d at 806-07; no Lincoln Navigators linkable to known gang

---

[4] Although TC-D's statements could have alerted another person to the officers' presence and intent to search, leading to an attempt to destroy evidence, the potential destruction of evidence is not a justification for a Buie sweep, which is permissible only for safety reasons. 494 U.S. at 327.

members were parked outside the home, United States v. Tapia, 610 F.3d 505, 507 (7th Cir. 2010), as amended on denial of reh'g, No. 09-1426, 2010 U.S. App. LEXIS 27517, at *1 (7th Cir. Aug. 16, 2010); and no recent and unexplained gunfire was likely to either alert anyone present and potentially dangerous that agents might soon arrive or cause them to otherwise be on alert. United States v. Parrott, 450 F. App'x 228, 230 (3d Cir. 2011); United States v. Tisdale, 921 F.2d 1095, 1097 (10th Cir. 1990). Rather, the inverse is true:  Appellant lived on a military base, not in a high-crime neighborhood or within a known gang war zone, even were such a setting enough to justify this exception to the Fourth Amendment, a question on which we express no opinion.  See generally United States v. Martins, 413 F.3d 139, 150 (1st Cir. 2005) (holding agents could consider area to justify sweep where "the inference of danger was much more real and immediate than a generic fear of what might happen in a high-crime area"); United States v. Atlas, 94 F.3d 447, 450-51 (8th Cir. 1996) (upholding a protective sweep in a "dangerous neighborhood, one that was high in gang activity" and noting "an area's propensity toward criminal activity is something that an officer may consider" along with other factors (citation omitted)); United States v. Burrows, 48 F.3d 1011, 1016 (7th Cir. 1995) (holding that while "[a] protective sweep is not justified simply because an area is 'poor' or a 'housing

project'" the area may be relevant where it "has been the recent scene of other violence or civil strife aimed at law enforcement officers" or "there are other articulable reasons for believing that . . . the area presents a real threat"); United States v. Richards, 937 F.2d 1287, 1291 (7th Cir. 1991) (upholding a protective sweep of an apartment in "one of the most violent and dangerous [neighborhoods] in East St. Louis" where the reputation of the area was one of several factors).  The rational inference for agents to make about a home on a military base would be of safety, rather than risk.

The ACCA erred in affirming the holding of the military judge with respect to the protective sweep.  As our holding eliminates the basis on which the ACCA found probable cause existed to conduct the MWD search of the house after the sweep, any review of the inevitable discovery doctrine must be undertaken without respect to the fruits of the sweep.  Although we did not grant, and thus do not decide, the question of the application of the inevitable discovery doctrine to the remaining evidence, we stress that "the inevitable discovery doctrine cannot rescue evidence obtained via an unlawful search simply because probable cause existed to obtain a warrant when the government presents no evidence that the police would have obtained a warrant."  United States v. Wicks, 73 M.J. 93, 103 (C.A.A.F. 2014) (internal quotation marks omitted).

## IV. DECISION

The decision of the United States Army Court of Criminal Appeals is reversed. The record of trial is returned to the Judge Advocate General for remand to that court for further action consistent with our resolution of the granted issue.